**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| HARRY B. PENNINGTON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-CV-2097 CM/DJW |
| | ) | |
| GB INTERNATIONAL S.P.A. | ) | |
| | ) | |
| Defendant. | ) | |

**NOTICE OF REMOVAL**

This Notice of Removal is filed on behalf of Defendant GB International S.P.A.

(GB International) pursuant to 28 U.S.C. §§ 1446(a).  As grounds for removal Defendant states:

1.     On or about February 13, 2008, Defendant was served a Petition filed in the

District Court of Wyandotte County, Kansas captioned <u>Harry B. Pennington v GB International</u>

<u>SPA</u> (Case No. 08-CV-317).  A copy of the Petition is attached as <u>Exhibit A</u>.

2.     Counsel for the Plaintiff, Justin J. Johl, and counsel for the Defendant, Mark G.

Stingley, agreed that Mr. Stingley would accept service on behalf of the Defendant and that

responsive pleadings would be due on April 1, 2008.

3.     Plaintiff's complaint prays for damages of $2,058,413.00, plus interest, attorneys

fees and costs.

4.     Plaintiff identifies himself as a resident of the State of Florida.

5.     Defendant is a corporation formed under Italian law with its principal place of

business in Modena, Italy.  For purposes of diversity jurisdiction, Defendant is a citizen of Italy.

6.     The federal court is provided diversity jurisdiction over cases in which one party

is a citizen of an American state and the other party is a citizen of a foreign country and the

amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.  28 U.S.C. § 1332 (a)(2).

7.     Federal diversity jurisdiction is proper as the parties are of diverse citizenship and the amount in controversy exceeds the jurisdictional minimum amount.

8.     Pursuant to 28 U.S.C. §1441, any civil action brought in a state court of which the district courts of the United States have original jurisdiction, may be removed by the defendant to the district court of the United States for the district and division embracing the place where the state court action is pending, provided that no party properly joined and served is a citizen of the state in which the original action was filed.

9.     Because the federal courts have original jurisdiction over the above-captioned civil action pursuant to 11 U.S.C. §1332(a)(2) and no defendant properly joined and served is a citizen of Kansas, the state in which the civil action was originally filed, Defendant is entitled to remove this civil action to the United States District Court for the District of Kansas.

10.    This Notice of Removal is filed within thirty days after receipt of the Petition. A copy of this Notice of Removal is being contemporaneously filed in the District Court of Wyandotte County, Kansas and promptly served on all adverse parties.

WHEREFORE, jurisdiction being proper in the United States District Court for the District of Kansas, Defendant GB International S.P.A. removes the subject action from the District Court of Wyandotte County, Kansas to the United States District Court for the District of Kansas, for trial in Kansas City, Kansas.

Respectfully Submitted,

**BRYAN CAVE LLP**


      /s/  William J. Maloney
Mark G. Stingley      KS Dist. #70083
William J. Maloney     KS # 17458
One Kansas City Place
1200 Main Street, Suite 3500
Kansas City, MO  64105-2100
Tel: 816-374-3200
Fax: 816-374-3300
wjmaloney@bryancave.com

Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was served this 5th day of March, 2008, via facsimile and U.S. Mail, postage prepaid, to:

Justin L. Johl
Shook, Hardy & Bacon LLP
2555 Grand Blvd.
Kansas City, MO  64108-2613

Attorney for Plaintiff


      /s/  William J. Maloney

FILED

2008 FEB 13  PM 3: 11

CLERK DISTRICT COURT
WYANDOTTE COUNTY, KANSAS

BY                    DEPUTY

IN THE DISTRICT COURT OF WYANDOTTE COUNTY, KANSAS
CIVIL COURT DEPARTMENT

HARRY B. PENNINGTON,          )
                             )
              Plaintiff,      )
                             )
vs.                          )      Case No. _08 CV 317_
                             )      Division No. _____
GB INTERNATIONAL S.P.A,       )      Chapter 60
                             )
              Defendant.      )
                             )

## PETITION

COMES NOW Plaintiff, Harry B. Pennington, by and through his counsel of record, and, for his Petition against the above-named Defendant, states and alleges as follows:

1.     Plaintiff, Harry B. Pennington, is an individual and resident of the State of Florida.

2.     Defendant GB International S.P.A. is, upon information and belief, a corporation organized pursuant to the laws of Italy.

3.     This Court has personal jurisdiction over the Defendant pursuant to K.S.A. 60-308(b) because the Defendant has transacted business in this State, entered into contracts to be performed in this State, and, pursuant to the underlying contract, has agreed to the jurisdiction of this Court.

4.     Venue is proper in this Court.

## <u>COUNT I:  BREACH OF CONTRACT</u>

5.     Plaintiff incorporates every statement, allegation, and averment set forth in Paragraphs 1-4, above, as if all such statements, allegations, and averments were set forth fully herein.

6.     On or about November 9, 2006, Pennington and Defendant entered into a Second Amended and Restated Shareholders Agreement (the "Contract").  A true and correct copy of the Contract is attached hereto as Exhibit "A" and incorporated herein by reference.

7.     Pursuant to the Contract, Pennington had a put right, entitling him to sell his ownership interest in American Crane and Tractor Parts, Inc. ("American Crane") to Defendant for the sum of Two Million Fifty-Eight Thousand Four Hundred and Thirteen Dollars ($2,058,413.00), if such put right was exercised between January 8, 2008, and March 31, 2008. (Exhibit A, at ¶ 2.9(A)(b), pp. 11-12.)

8.     By letter dated January 9, 2008, a true and correct copy of which is attached hereto as Exhibit "B" and incorporated herein by reference, Plaintiff exercised his put right pursuant to the Contract and as set forth in Paragraph 7, above, and expressly demanded payment of the sum of $2,058,413.00 in exchange for his ownership interest in American Crane.

9.     In breach of the Contract, Defendant has failed and refused to pay Plaintiff the agreed sum of $2,058,413.00 in exchange for his ownership interest in American Crane.

10.    Plaintiff has fully complied with all terms and conditions of the Contract and is entitled to enforce each and every provision of the Contract.

11.    As a result of Defendant's breach of the Contract, Plaintiff has incurred damages in the sum of $2,058,413.00, plus interest, attorneys' fees, and Court costs.

WHEREFORE, Plaintiff, Harry B. Pennington, respectfully requests that the Court enter Judgment under Count I of this Petition in his favor and against the Defendant, GB

International, S.P.A., for the sum of Two Million Fifty-Eight Thousand Four Hundred and Thirteen Dollars ($2,058,413.00), plus interest, attorneys' fees, and the costs of this action. In addition, Plaintiff respectfully requests any further Order or relief the Court deems just and equitable.

## COUNT II:  UNJUST ENRICHMENT

12.    Plaintiff incorporates every statement, allegation, and averment set forth in Paragraphs 1-11, above, as if all such statements, allegations, and averments were set forth fully herein.

13.    Through the acts and omissions set forth above, Defendant has been unjustly enriched at Plaintiff's expense in the sum of Two Million Fifty-Eight Thousand Four Hundred and Thirteen Dollars ($2,058,413.00), plus interest, attorneys' fees, and the costs of this action.

WHEREFORE, Plaintiff, Harry B. Pennington, respectfully requests that the Court enter Judgment under Count II of this Petition in his favor and against the Defendant, GB International, S.P.A., for the sum of Two Million Fifty-Eight Thousand Four Hundred and Thirteen Dollars ($2,058,413.00), plus interest, attorneys' fees, and the costs of this action. In addition, Plaintiff respectfully requests any further Order or relief the Court deems just and equitable.

## COUNT III:  FRAUD

14.    Plaintiff incorporates every statement, allegation, and averment set forth in Paragraphs 1-13, above, as if all such statements, allegations, and averments were set forth fully herein.

15.    As of the date of the Contract, Defendant knew that Plaintiff had executed a First Amended Employment Agreement ("FAEA") with American Crane on or about June 22, 2006.

3

2792302v3

16.    Defendant knew that Plaintiff's employment with American Crane would end under the FAEA on January 8, 2008. Defendant was aware of, and approved all of the terms and conditions of the FAEA.

17.    Defendant wrongfully and fraudulently induced Plaintiff to enter into the Contract based upon the representation that he could execute his put right under the Contract between January 8, 2008, and March 31, 2008. Upon exercising his option, Plaintiff would then receive the agreed sum of $2,058,413.00 in exchange for the sale of his ownership interest in American Crane. Defendant knew or had reason to know that Plaintiff's employment with American Crane would end on January 8, 2008. Despite this knowledge, Defendant took the position on January 9, 2008, in writing, that Plaintiff had terminated his employment relationship with American Crane "without good reason" and had therefore waived his right to recover the agreed sum of $2,058,413.00, pursuant to Section 2.9A(d) of the Contract, despite the fact that the FAEA had expired on its own terms on January 8, 2008. Defendant then purported to exercise its alleged right to purchase Plaintiff's ownership interest in American Crane for less than $1,000.00 rather than the $2,058,413.00 set forth in the Contract.

18.    Defendant's acts and omissions, as set forth above, were intentional and malicious and constitute fraud under Kansas law.

19.    Through the acts and omissions set forth above, Defendant has caused Plaintiff to incur damages in the sum of Two Million Fifty-Eight Thousand Four Hundred and Thirteen Dollars ($2,058,413.00), plus interest, attorneys' fees, and the costs of this action.

WHEREFORE, Plaintiff, Harry B. Pennington, respectfully requests that the Court enter Judgment under Count III of this Petition in his favor and against the Defendant, GB International, S.P.A., for the sum of Two Million Fifty-Eight Thousand Four Hundred and Thirteen Dollars ($2,058,413.00), plus interest, attorneys' fees, and the costs of this action. In

2792302v3

addition, Plaintiff respectfully requests any further Order or relief the Court deems just and equitable.

## COUNT IV:  BAD FAITH

20.    Plaintiff incorporates every statement, allegation, and averment set forth in Paragraphs 1-19, above, as if all such statements, allegations, and averments were set forth fully herein.

21.    Defendant's acts and omissions as set forth above constitute the tort of bad faith under Kansas law.

22.    Through the acts and omissions set forth above, Defendant has denied Plaintiff the benefits of the Contract and has caused Plaintiff to sustain damages in the sum of Two Million Fifty-Eight Thousand Four Hundred and Thirteen Dollars ($2,058,413.00), plus interest, attorneys' fees, and the costs of this action.

WHEREFORE, Plaintiff, Harry B. Pennington, respectfully requests that the Court enter Judgment under Count IV of this Petition in his favor and against the Defendant, GB International, S.P.A., for the sum of Two Million Fifty-Eight Thousand Four Hundred and Thirteen Dollars ($2,058,413.00), plus interest, attorneys' fees, and the costs of this action.  In addition, Plaintiff respectfully requests any further Order or relief the Court deems just and equitable.

SHOOK, HARDY & BACON L.L.P.

By: _____
    Justin J. John, #17966
    Kevin J. Karpin, #16947

2555 Grand Blvd.
Kansas City, Missouri  64108-2613
Telephone:  816.474.6550
Facsimile:  816.421.5547
ATTORNEYS FOR PLAINTIFF

5

2792302v3

# SECOND AMENDED AND RESTATED
# SHAREHOLDERS AGREEMENT

THIS SECOND AMENDED AND RESTATED SHAREHOLDERS AGREEMENT (this "Agreement"), made as of the 9th day of November 2006, by and among American Crane and Tractor Parts, Inc. (the "Company"), GB International S.p.A. ("GB"), GB Miami S.r.l., a corporation organized pursuant to the laws of Italy ("GB Miami" together with GB, "The GB Companies"), Jeffrey A. Weiner ("Weiner"), Harry B. Pennington ("Pennington"), Kenneth P. Stacy ("Stacy") and Carlos Alberto Teran Bendaña ("Carlos") (GB, GB Miami, Weiner, Pennington, Stacy and Carlos, are collectively referred to as the "Shareholders").

WHEREAS, GB, Weiner, Pennington, and Stacy entered into that certain Amended and Restated Shareholders Agreement dated as of the 22nd day of June, 2006, as amended by that certain Waiver to the Amended and Restated Shareholders Agreement dated as of October 22, 2006 (together, the "Original Amended Agreement"), which amended and restated that certain Shareholders Agreement dated January 9, 2004, as amended on September 29, 2005 (the "Original Agreement"), and now desire to amend and restate the Original Amended Agreement so as to modify certain terms and conditions as more particularly set forth herein;

WHEREAS, the Company is a duly organized and existing corporation under the laws of the State of Missouri and has a total authorized capitalization of 50,000 shares of common stock, $1.00 par value ("Common Stock");

WHEREAS, on the date of the Original Agreement, the Shareholders entered into a stock purchase agreement (the "Stock Purchase Agreement"), whereby, in exchange for the purchase price of Nine Million Nine Hundred Fifty Thousand Dollars ($9,950,000.00), GB purchased 3,940.3 shares of Common Stock (representing a 65% total ownership interest in the Company) from Weiner, Pennington and Stacy (collectively referred to herein as the "Continuing Shareholders");

WHEREAS, after giving effect to the transactions contemplated by the Stock Purchase Agreement, (i) GB is the record and beneficial owner of 3,940.3 shares of Common Stock, (ii) Weiner is the record and beneficial owner of 1,108.625 shares of Common Stock, (iii) Pennington is the record and beneficial owner of 907.025 shares of Common Stock, and (iv) Stacy is the record and beneficial owner of 106.05 shares of Common Stock;

WHEREAS, on the date hereof, pursuant to that certain Agreement and Plan of Merger (the "Merger Agreement") by and among (the "Company") and Teran Tractor Company, a Florida corporation ("TT"), TT merged with and into the Company and each stockholder of TT received shares of the Company;

WHEREAS, after giving effect to the transactions contemplated by the Merger Agreement, (i) GB is the record and beneficial owner of 3,940.3 shares of Common Stock, (ii) Weiner is the record and beneficial owner of 1,108.625 shares of Common Stock, (iii) Pennington is the record and beneficial owner of 907.025 shares of Common Stock, (iv) Stacy is the record and beneficial owner of 106.05 shares of Common Stock, (v) GB Miami is the record and beneficial owner of 692.723 shares of Common Stock; and (vi) Carlos is the record and beneficial owner of 373.005

1885910.5

EXHIBIT "A"



shares of Common Stock (the 7,127.728 number of shares outstanding are collectively referred to as the "Shares"); and

WHEREAS, the parties hereto recognize that GB Miami's direct or indirect owners are the same as GB's and as such shall have the same rights and obligations of GB as set forth in the Agreement and shall be defined and grouped together with GB, as "The GB Companies";

WHEREAS, the parties hereto now desire to amend the Original Amended Agreement and provide for the inclusion of GB Miami (as discussed above) and Carlos, all as more particularly set forth herein; and

WHEREAS, the Shareholders deem it to be in the best interests of the Company and the Shareholders to make certain provisions for the management and regulation of the Company's affairs and to establish the rights and obligations of the Shareholders.

NOW, THEREFORE, in consideration of the premises and the covenants hereinafter set forth, the parties hereto hereby agree as follows:

ARTICLE I

Employment; Management of the Company

1.1     Employment Agreements. (a) On June 22, 2006, in accordance with the terms of the Stock Purchase Agreement, each of Weiner, Pennington and Stacy have executed an amendment to their respective employment agreements with the Company (each, as amended, an "Employment Agreement"). Except as set forth herein, the Continuing Shareholders shall be responsible for the management and the day to day operations of the Company, with the duties, responsibilities, obligations and rights set forth in each of the Continuing Shareholder's Employment Agreements.

(b) On the date hereof, in accordance with the terms of that certain letter of intent dated July 7, 2006 by and between the Company and TT, as amended on August 31, 2006 (the "LOI"), Carlos has executed a new employment agreement with the Company (the "Carlos Employment Agreement"). Carlos shall serve as the Managing Director of Latin American markets of the Company, with the duties, responsibilities, obligations and rights set forth in the Carlos Employment Agreement.

1.2     Board of Directors (i) The Board of Directors of the Company shall initially consist of seven (7) directors, with (A) four (4) directors designated (and removed) by The GB Companies, (B) two (2) directors designated (and removed) by the Continuing Shareholders (in accordance with Section 5.13 of this Agreement) (the Continuing Shareholders agree that on March 31, 2008, Stacy shall replace Pennington on the Company's Board of Directors as one of the two directors designated by the Continuing Shareholders), and (C) one (1) director designated (and removed) by Carlos until the date of Termination as that term is defined in the Carlos Employment Agreement; provided, however, the Board of Directors of the Company shall not consist of more than nine (9) directors during the term of this Agreement.  The initial directors of the Company shall be as set forth in Schedule 1.2 hereof. The GB Companies shall designate the Chairman of the Board. Each of the Continuing Shareholders, Carlos and The GB Companies agree to vote for all such designees to the Board of Directors.  In the event that, in the future, only one Continuing Shareholder remains a

2



shareholder of the Company, such Continuing Shareholder shall be permitted to designate only one (1) director. In the event Carlos is no longer an employee of the Company, he shall no longer be entitled to designate a director, and such director shall thereafter be appointed and removed by The GB Companies. Notwithstanding anything to the contrary herein, only the approval of a Majority of the Board (as defined in Section 1.3) shall be required to (i) increase the number of the Board of Directors (or subsequently reduce it to seven (7) directors), or (ii) select and appoint additional directors (provided that the Continuing Shareholders shall continue to select and appoint two (2) directors and Carlos shall continue (so long as he is an employee of the Company) to select and appoint one (1) director, each to the extent otherwise set forth in this Agreement). Any Continuing Shareholder that either (i) no longer owns any Shares, or (ii) is no longer an employee of the Company, shall not be permitted to be a director of the Company.

(ii)     Each of the Shareholders agrees to vote all of the Shares held or controlled by such Shareholder, and the Company agrees to take any and all actions necessary, to cause:

(A)     the election as directors of the Company of the number of directors indicated above, as nominated by the Continuing Shareholders and/or Carlos, as applicable; and

(B)     the election as directors of the Company of all of the remaining directors, as nominated by The GB Companies.

(b)     Regular meetings of the Board of Directors may be held at such time and place, as shall from time to time be fixed by the Board as determined by the Chairman. At least thirty (30) days prior written notice shall be given to all directors of regular meetings. The Company shall hold at least one regular meeting each fiscal quarter. The Chairman will preside at all meetings of the Board.

(c)     Special meetings may be called by any director. Special meetings shall be held at such place, as shall be fixed by the director calling the meeting and stated in the notice or waiver of notice of the meeting. Unless waived, notice of each special meeting of the Board of Directors, stating the time and place of the meeting, shall be given to each director by delivered letter, by telefax, e-mail or by personal communication either over the telephone or otherwise, in each such case not less than five (5) days nor more than ten (10) days prior to the meeting. Notices of special meetings of the Board of Directors and waivers thereof must state the purpose or purposes of the meeting.

(d)     Notwithstanding anything to the contrary contained herein, a member of the Board of Directors may participate in any meeting of the Board of Directors by means of a conference telephone or similar communications equipment allowing all persons participating in the meeting to hear each other at the same time, and participation in a meeting by such means shall constitute presence in person at such meeting.

(e)     Any action required or permitted to be taken at any meeting of the Board of Directors may be taken without a meeting if all directors consent thereto in a writing or writings and the writing or writings are filed with the minutes of proceedings of the Board of Directors.

3



(f)     A Majority of the Board (as defined in Section 1.3 below) shall determine from time to time the amount of the compensation, if any, to be paid to the directors, including its chairman. All directors shall be compensated equally. The Company shall reimburse directors for travel and entertainment expenses reasonably incurred by directors on behalf of the Company to attend the meetings of the Board of directors.

(g)     To the fullest extent provided by applicable law, the Company shall at all times (i) indemnify and reimburse each of the Company's directors against liability for actions and omissions to act in their capacity as directors of the Company, and (ii) exculpate each of the Company's directors from liability to Company for monetary damages for breach of their fiduciary duties as directors. The Company may maintain directors and officers liability insurance, at levels and with the terms specified from time to time by a Majority of the Board (as defined in Section 1.3 below).

1.3     Decisions of the Board. Each of the following decisions shall require the consent of the Board of Directors and the approval of the Continuing Shareholders (in accordance with Section 5.13 of this Agreement) (the "Approval Rights"):

(a)     Approval of the annual budget of the Company until the exercise of Weiner's Second Put Right (as defined in Section 2.9(A)(b)(ii)(C) hereof) and the full payment by GB to Weiner for such Second Put Right as required by Section 2.9(A)(b) (at which point, this Section 1.3(a) shall be deemed of no further force or effect); provided, however, that no Approval Rights shall be required with respect to interest expense, banking expenses, depreciation and amortization of any annual budget. The Continuing Shareholders acknowledge and agree that this Approval Right with respect to the annual budget is intended solely to protect the Continuing Shareholders in their capacities as employees under each respective Employment Agreement by limiting GB's ability to establish unrealistic Company goals that could impact (i) each Continuing Shareholder's ability to achieve or meet, among other things, employee bonuses, continued employment, payment of compensation and related matters under each Employment Agreement or (ii) the employee objectives set forth in the annual budget, as each respective objective effects each respective Employment Agreement;

(b)     Any amendment or modification by the Company of the Supply Agreement (as defined in the Stock Purchase Agreement);

(c)     Any merger or acquisition, or other business transaction, in which (i) the Company issues (or is committed to issue) additional shares of any or all classes of stock thereby diluting the existing Shareholders' ownership percentages of the Company in any manner or method, or (ii) the ownership percentages of the existing Shareholders in the Company are otherwise directly or indirectly diluted as a result of any merger, acquisition or other business transaction, until the exercise of Weiner's First Put Right (as defined in Section 2.9(A)(b)(ii)(B) hereof) and the full payment by GB to Weiner for such First Put Right as required by Section 2.9(A)(b) (at which point, this Section 1.3(c) shall be deemed of no further force or effect);

(d)     Approval of any expenses not directly related to the business of the Company; and



4

(e)     Approval of all actual Operating expenses (as defined in the Company's Audited Statements of Income) in excess of $100,000 in the aggregate for any calendar year of the Company until the exercise of Weiner's First Put Right (as defined in Section 2.9(A)(b)(ii)(B) hereof) and the full payment by GB to Weiner for such First Put Right as required by Section 2.9(A)(b) (at which point, this Section 1.3(e) shall be deemed of no further force or effect); provided, however, that no Approval Rights shall be required with respect to interest expense, banking expenses, depreciation and amortization.

Notwithstanding the above, (i) the election, removal and replacement of the Continuing Shareholders from their offices (except as expressly limited by the terms of each of the Continuing Shareholders' respective Employment Agreements), and (ii) all other matters, decisions and actions normally reserved for the Board of Directors and not specifically set forth above as requiring the Approval Rights, shall, in each case, require the consent of a majority in number of the Board of Directors without the approval of the Continuing Shareholders (a "Majority of the Board"); provided, however, that in no event shall the Board of Directors take any action that may cause a violation of any Employment Agreement, the Carlos Employment Agreement or this Agreement.

1.4     Dividend Policy.  Each of the Continuing Shareholders and/or Carlos and The GB Companies, on behalf of themselves and the directors they appoint, irrevocably agree that the Company shall declare and distribute dividends at least semi-annually (consistent with the same policy as is currently in effect under the Original Agreement which policy, the parties agree, shall continue in the future during the term of this Agreement) limited only by any restrictions or loan covenants imposed by any financial institution extending credit from time to time to the Company. The amount of any dividend distribution shall take into account the provisions of Section 2.12 of this Agreement. GB further agrees that to the extent necessary to meet its obligations under the Escrow Agreement (as defined below), dividends distributed by the Company to GB shall be deposited directly by the Company into escrow (provided that an amount sufficient to pay all applicable U.S. and Italian taxes due from GB on such dividend shall be paid directly by the Company to such other account or accounts as GB shall indicate from time to time; provided, however, that such taxes shall not exceed eight percent (8%) of the dividend on an annualized basis) pursuant to the terms of that certain Amended and Restated Escrow Agreement dated June 22, 2006 between GB, the Continuing Shareholders and Chicago Title Insurance Company as set forth in Exhibit A (the "Escrow Agreement"). Notwithstanding the above, the Company shall pay all dividend amounts in excess of the amounts required to fulfill GB's then current obligations under the Escrow Agreement, directly to an account(s) indicated from time to time by GB.

1.5     Resolution of Board of Director Disputes. (a) INTENTIONALLY OMITTED.

(b)     INTENTIONALLY OMITTED.

(c)     INTENTIONALLY OMITTED.

## ARTICLE II

Certain Restrictions on Sale and Ownership of Shares

5

2.1     General.  The Shares may not be sold, assigned, pledged, hypothecated or otherwise transferred except with the prior written consent of The GB Companies, or as otherwise expressly permitted in this Agreement.

2.2     Legend; Securities Law Restrictions.

(a)     Each certificate representing the shares of Common Stock shall bear the following legend, which shall be prominently placed:

*The shares represented by this certificate are subject to the terms and conditions of a the Second Amended and Restated Shareholders Agreement, dated as of November 9, 2006, among American Crane and Tractor Parts, Inc. and its shareholders, copies of which are on file with the Secretary of the Company, and are held and may be sold, assigned, transferred, pledged or otherwise disposed of only in accordance therewith.*

(b)     The Shares may not be sold, transferred, assigned or otherwise disposed of unless such sale, transfer, assignment or disposition is made pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "Securities Act"), or the Company receives an opinion of counsel, reasonably satisfactory to the Company, stating that such sale, transfer, assignment or disposition is exempt from the registration and prospectus delivery requirements of such Act. Each certificate representing such Shares shall bear the following legend, which shall be prominently placed:

*The securities represented by this certificate have not been registered under the Securities Act of 1933 or applicable state securities laws. These securities have been acquired for investment and not with a view to distribution or resale, and may not be mortgaged, pledged, hypothecated or otherwise transferred without an effective registration statement for such securities under the Securities Act of 1933 and compliance with applicable state securities laws, or the availability of an exemption from the registration provisions of the Securities Act of 1933.*

2.3     Agreement Binding on Certain Transferees.  Prior to any sales, disposition, assignment or other transfer of Shares (each a "Transfer") by a Shareholder, the transferee of such Shares (the "Successor Shareholder") must agree in writing to assume the obligations of the transferring Shareholder under this Agreement with respect to the Shares being transferred, whereupon the Successor Shareholder shall succeed to the rights of the transferring Shareholder hereunder (except as limited herein) with respect to the Shares being transferred. For purposes of this Agreement, any and all references to a Shareholder (including by reference to its proper name) shall be deemed to refer to such Shareholder or to its Successor Shareholder, as the case may be; provided, however, that in the event that GB or the Company purchases a Continuing Shareholder's Shares, the rights of such Shareholder to designate directors of the Company as provided in Section 1.2 above (if any) shall vest in and thereafter be exercisable by the remaining Continuing Shareholders except as otherwise set forth to the contrary in this Agreement.

2.4     Compliance with Transfer Provisions.  In the event that the Shareholders or any of them (a "Transferor") shall fail to comply with agreements contained herein with respect to the

6



transfer of shares of Common Stock, any such transfer by such Transferor shall be void and of no effect whatsoever, (i) no dividends of any kind whatsoever nor any distribution pursuant to liquidation or otherwise shall be paid by the Company in respect of such shares (all such dividends and distributions being deemed postponed during the period of non-compliance), (ii) the voting rights of such shares on any matter whatsoever, including, but not limited to, the right to designate directors as set forth in Section 1.2 hereof, and (iii) each of the rights and protections set forth in this Article II, including, but not limited to, the Put Rights and the Minimum Value Protection (each as defined below) with respect to such shares shall, in each such case, be suspended during the period commencing with such Transferor's initial failure of compliance with such agreements and ending on the earlier of the date that such Transferor effects such compliance or the date on which the Company receives evidence reasonably satisfactory to it that such attempted sale has been rescinded.

2.5   Prohibition on Transfers.  (a)  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT OR ANY OTHER AGREEMENT AMONG THE SHAREHOLDERS AND/OR THE COMPANY, EXCEPT AS EXPRESSLY PERMITTED IN SECTIONS 2.6 OR 2.9 HEREOF, NONE OF THE CONTINUING SHAREHOLDERS SHALL PRIOR TO JANUARY 9, 2014, NOR CARLOS, PRIOR TO APRIL 29, 2015, HAVE THE RIGHT TO TRANSFER ANY OR ALL OF THEIR SHARES WITHOUT THE APPROVAL OF THE GB COMPANIES, WHICH MAY BE WITHHELD IN THE GB COMPANIES' SOLE DISCRETION.

2.6   Tag-Along Rights.

(a)   No Shareholder (the "Selling Shareholder") shall have the right to sell any or all of his Shares to a third party purchaser (a "Third Party Purchaser") unless each of the remaining Shareholders is given an opportunity to participate in such sale and sell to such Third Party Purchaser a pro rata number of such remaining Shareholder's Shares, at the same price per share, for the same kind of consideration and on the same terms and conditions as apply to the proposed sale or other disposition by such Selling Shareholder (the "Tag-Along Rights"). For clarification, none of the Continuing Shareholders nor Carlos shall have the right to be a Selling Shareholder.

(b)   At least thirty (30) days prior to the consummation of any sale or other disposition of the Shares which is subject to the provisions of Section 2.6(a), the Selling Shareholder shall cause the offer from the Third Party Purchaser to purchase or otherwise acquire the Shares from the Selling Shareholder to be reduced to writing (the "Offer") and shall deliver written notice of the Offer, together with a copy of the Offer (the "Notice") to the remaining Shareholders. Each Offer shall include an offer to purchase or otherwise acquire from the remaining Shareholders, according to the terms and subject to the conditions of this Agreement, the pro rata percentage of the Shares then owned by the Shareholders. Each Notice shall also include as an exhibit the form of definitive agreement proposed to be entered into by the Third Party Purchaser and the Selling Shareholder for the purchase of such Shares (the "Definitive Agreement"); provided, however, that if the Definitive Agreement is not available at the time the Notice is given, it shall be provided to the Shareholders as soon as it is available.

(c)   In the event a Shareholder desires to accept the Offer with respect to such Shareholder's Shares, said Shareholder shall do so by delivering to the Selling Shareholder a written notice stating their irrevocable acceptance of the Offer with respect to such Shares (the "Acceptance Notice"), which Acceptance Notice shall be delivered to the Selling Shareholder within thirty (30)

7

days after the later of the delivery of the Notice or the Definitive Agreement. In addition, such Acceptance Notice shall include a written undertaking of the Shareholders to execute and deliver a definitive agreement with the Third Party Purchaser containing the same terms and conditions as the Definitive Agreement. In the event the Shareholders do not deliver an Acceptance Notice to the Selling Shareholder in accordance with the provisions of this Section 2.6(c), or fail to execute and deliver a Definitive Agreement when requested to do so by the Selling Shareholder, the Shareholders shall be deemed to have irrevocably rejected the Offer.

(d)    The Selling Shareholder shall have until ninety (90) days from the expiration of the thirty (30) day period set forth in Section 2.6(c) in which to consummate the sale or other disposition to the Third Party Purchaser of such Shares of the Selling Shareholder and the Shareholders which have accepted the Offer on terms not less favorable to the Shareholders than those set forth in the Notice.

(e)    The Shareholders and Selling Shareholder will each pay their own expenses incurred in connection with the sale or other disposition of the Shares in which the Shareholders have exercised Tag-Along Rights, and the Company will not bear any expenses in connection with the sale, other than any expense reimbursement, topping fee, break-up fees or other amounts payable to a Third Party Purchaser pursuant to a Definitive Agreement, which expenses shall be the obligation of the Company and not any Shareholder.

(f)    The Selling Shareholder may not assign the Acceptance Notice. Both the assignment and the Acceptance Notice shall be null and void upon any such attempted assignment.

2.7    Bring-Along Rights. (a) In the event that The GB Companies, at any time, propose to sell or otherwise dispose of all of their Shares to a Third Party Purchaser, then the remaining Shareholders shall at the election of The GB Companies, also sell or otherwise dispose of their Shares pursuant to the terms and conditions negotiated by The GB Companies for the sale or other disposition of Shares; provided, however, that the terms and conditions (including the price per share and form of consideration) for such sale shall be no less favorable to the other Shareholders than to The GB Companies. Subject to the foregoing, the Shareholders hereby agree, at the request of The GB Companies, (i) to execute and deliver a definitive agreement providing for the sale of their Shares, together with any related documents, in such form as reasonably determined by The GB Companies, and (ii) to vote all of the Shares in favor of approval and adoption of a merger or other acquisition agreement between the Company and the Third Party Purchaser, in such form as reasonably determined by The GB Companies. The GB Companies and each of the other Shareholders will each pay their own expenses incurred in connection with the sales or other dispositions of their respective Shares, and the Company will not bear any expenses in connection with the sale, other than any expense reimbursement, topping fee, break-up fee or other amounts payable to the Third Party Purchaser pursuant to a Definitive Agreement, which expenses shall be the obligation of the Company and not any Shareholder.

(b)    Notwithstanding anything to the contrary in subsection 2.7(a) above, the parties agree that in the event that The GB Companies determine to sell all of their Shares (a "GB Company Sale") and either (i) "brings-along" the Continuing Shareholders (as provided for in subsection 2.7(a) above), or (ii) one or more of the Continuing Shareholders exercise their "Tag-Along Rights" (as set forth in Section 2.6 hereof); the total proceeds paid to each of the Continuing



Shareholders in connection with a GB Company Sale shall not be less than each such Continuing Shareholder's Minimum Value (as defined in Section 2.9(A)(b) below), or in the case that one or more of the Continuing Shareholders exercises his "Tag-Along" Rights, the total proceeds paid to each such Continuing Shareholder in connection with such sale to a Third Party Purchaser shall not be less, on a pro rata basis (i.e. based on how many Shares were actually sold by such Continuing Shareholder) then each such Continuing Shareholder's Minimum Value (i.e. proportionately for the Shares actually sold by such Continuing Shareholder); provided, however, that the Minimum Value Protection (as defined in Section 2.9(A)(b) below) shall not apply to any specific Continuing Shareholder (i) if, at the time of the GB Company Sale or other sale to a Third Party Purchaser such Continuing Shareholder's employment with the Company has been terminated "with cause" (as defined in the applicable Employment Agreement) or such Continuing Shareholder has terminated his employment with the Company "without good reason" (as defined in the applicable Employment Agreement) or (ii) after the tenth (10th) anniversary of the Original Agreement.

     2.8   <u>Right of First Refusal</u>.  In the event that a Continuing Shareholder and/or Carlos desires to sell all or any of his Shares in the Company pursuant to a bona fide, arms-length transaction, such sale shall require the written consent of The GB Companies if prior to the tenth (10th) anniversary of the Original Agreement in the case of the Continuing Shareholders or prior to April 29, 2015 in the case of Carlos, then such Continuing Shareholder and/or Carlos (the "Offeror") shall first:

     (a)   offer such Shares to each of the other Continuing Shareholders and Carlos (each, an "Offeree" and, collectively, the "Offerees").  The Offeror shall give written notice to each of the Offerees (the "Offer Notice") setting forth the purchase price for the Shares and all other material terms and conditions of such proposed sale (including, without limitation, the financing terms, if any, and the closing date).  Each Offeree shall have fifteen (15) days after receipt of the Offer Notice within which to accept such offer to purchase all, but not less than all, of the offered Shares.  An Offeree's failure to respond timely to an Offer Notice shall be deemed a rejection of such offer.  If only one (1) Offeree accepts the offer, such Offeree shall be entitled to purchase all, but not less than all, of the offered Shares on the same terms and conditions set forth in the Offer Notice.  If more than one (1) Offeree accepts the offer to purchase, the Offerees so accepting shall be entitled to acquire the offered Shares pro-rata, on the same terms and conditions as set forth in the Offer Notice.

     In the event that the other Continuing Shareholders and Carlos do not purchase all of the offered Shares, such Offeror shall then offer the remaining Shares to The GB Companies in accordance with the provisions set forth above in this subsection 2.8(a) and The GB Companies shall have fifteen (15) days after receipt of an Offer Notice to purchase all, but not less than all, of the offered Shares on the terms and conditions set forth in the Offer Notice.

     (b)   If the Offerees and/or The GB Companies do not accept the offer to purchase all of the offered Shares, then the Offeror may consummate the proposed third-party sale (with respect to those Shares not purchased by the Offerees), provided, and upon the express condition, that such Third Party Purchaser agrees in writing to assume, and to be bound by the terms and conditions of, this Agreement, as the same and the other operative agreements of the Company may be amended and modified from time to time.  An original counterpart of such assignment and assumption agreement, in form and substance reasonably satisfactory to the Company's counsel,

9



shall be delivered to the Secretary within ten (10) days after the transaction is consummated. If such sale is not consummated on substantially and materially the same terms as set forth in the Offer Notice within ninety (90) days after the mailing of the Offer Notice, the provisions of this Section shall again apply to a proposed sale of Shares.

(c)     Notwithstanding anything to the contrary above, in the event that a Continuing Shareholder and/or Carlos desires to sell its Shares to a "competitor" (as determined in the reasonable discretion of the Majority of the Board), then, prior to such sale, such selling Shareholder must obtain the approval of the Majority of the Board.

2.9     Put and Call Rights.

A.     Continuing Shareholders:

(a)     For purposes of this Section 2.9(A) the following terms shall have the following meanings:

The determination of "Enterprise Value" shall be equal to the most recent fiscal year's EBITDA multiplied by six (6), where:

"EBITDA" shall mean net income, including rental income, as defined by U.S. Generally Accepted Accounting Principles, as consistently applied from year to year, and Miscellaneous Items, before interest (income and expense), Income Taxes (defined exclusively as Federal income, state income and local income tax expense/benefit as well as any other tax expense/benefit which is measured as a function of the Company's gross profit or net earnings and which is reported as Income Taxes in the Company's audited Statement of Income or Loss, in accordance with SFAS 109 – Accounting for Income Tax), depreciation and amortization, and which shall exclude all items of extraordinary and exceptional income and expense. "Miscellaneous items" shall only include the following items of income and expenses: volume discounts, rebates, co-op advertising revenue, all bank account activity charges, credit card transaction fees, letter of credit fees, as well as vendor and customer write-offs, customer and/or vendor overpayments and adjustments, write-offs of expired or unused vendor and customer credit memorandums, vendor price adjustments, resolutions and settlement of customer claims, or such other items of income or expense expressly approved by the Majority of the Board. Each item shall be established in accordance with the Financial Statements, as such term is defined in the Stock Purchase Agreement.

"Equity Value of the Company" shall mean the Enterprise Value of the Company minus the Company's Net Financial Position, where:

"Net Financial Position" shall mean all interest bearing debt of any nature whatsoever, including, but not limited to, controlled disbursements, bank overdraft or similar, less all cash, cash equivalents and liquid securities as of December 31 of the most recent fiscal year used in establishing the "Equity Value of the Company;"



10

provided, however, that all trade payables and receivables with GB and/or its affiliates which are past due (in the ordinary course of business) by more than thirty (30) days shall be considered interest bearing debt.

"Future Valuation Price," as applied to Stacy, shall mean Stacy's pro rata ownership of Shares as of the date of this Agreement, as compared to all of the Continuing Shareholders (i.e. for Stacy – 5.0 %), multiplied by Thirty Five Percent (35%) of the Equity Value of the Company as of the applicable date (or such lesser percentage to the extent of any and all dilution of stock ownership of the Continuing Shareholders after the date of the Original Agreement (i.e. January 9, 2004). For example, if the Company issues an additional 606.2 shares after the date hereof the "Thirty Five Percent (35%)" shall be deemed reduced to 31.8% (i.e. (6,062/6,666.2) x 35% = 31.8%).

"Call Valuation Price" shall mean the Future Valuation Price as to Stacy and the Minimum Value (as defined in Section 2.9(A)(b) below) as to Weiner and Pennington.

"Put Valuation Price" shall mean eighty five percent (85%) of the Future Valuation Price as to Stacy and one hundred percent (100%) of the Minimum Value (as defined in Section 2.9(A)(b) below) as to Weiner and Pennington.

"Future Purchase Price" shall mean the amount actually paid to the Continuing Shareholders pursuant to this Section 2.9(A).

(b)    (i)    Beginning on the tenth (10th) anniversary of the date of the Original Agreement and continuing indefinitely thereafter, any of the Continuing Shareholders, individually, shall have the right, but not the obligation, to require GB to purchase all, but not less than all, of the Shares owned by such Continuing Shareholder (a "Put Right") for a purchase price equal to the Put Valuation Price applicable to each Continuing Shareholder.

(ii)    Notwithstanding the foregoing Put Right, any of the Continuing Shareholders, individually, shall have a Put Right or obligation (as set forth below) to require GB to purchase the Shares owned by such Continuing Shareholder, and GB shall purchase the Shares, as follows:

(A)    Between January 8, 2008, and March 31, 2008, Pennington shall exercise a Put Right for all of his Shares for a purchase price equal to Pennington's Minimum Value (as defined below) ("Pennington's Put Right").

(B)    Between January 8, 2009, and March 31, 2009, Weiner shall exercise a Put Right for 502.425 Shares of the Company for a purchase price equal to Two Million Seven Hundred Ninety-five Thousand Three Hundred Seventy-five U.S. Dollars ($2,795,375.00) ("Weiner's First Put Right").

(C)    Between January 8, 2014, and March 31, 2014, Weiner shall exercise a Put Right for 606.20 Shares of the Company for a purchase price equal to Weiner's Minimum Value (as defined below) ("Weiner's Second Put Right").

11




(D) Between January 8, 2014, and March 31, 2014, Stacy may exercise a Put Right for all of his Shares for a purchase price equal to Stacy's Minimum Value (as defined below) ("Stacy's Put Right").

provided, however, that under no circumstances shall the consideration paid to such Continuing Shareholder by GB for the Shares under the Put Right exercised under this subsection 2.9(A)(b)(ii) be less than such Continuing Shareholder's "Minimum Value" of all of the Shares owned by the Continuing Shareholders (the "Minimum Value Protection"). "Minimum Value" shall have the following meaning:

(X) For Weiner, "Minimum Value" shall mean Five Million Two Hundred Ninety-five Thousand Three Hundred Seventy-five U.S. Dollars ($5,295,375.00) if prior to Weiner's First Put Right; and Two Million Five Hundred Thousand U.S. Dollars ($2,500,000.00) following the exercise of Weiner's First Put Right ("Weiner's Minimum Value").

(Y) For Pennington, "Minimum Value" shall mean Two Million Two Hundred Eighty-seven Thousand One Hundred Twenty-one U.S. Dollars ($2,287,121.00); but in the event that Pennington exercises Pennington's Put Right under Section 2.9(A)(b)(ii)(A), Pennington's Minimum Value shall be deemed to be only Two Million Fifty-eight Thousand Four Hundred Thirteen U.S. Dollars ($2,058,413.00) ("Pennington's Minimum Value").

(Z) For Stacy, "Minimum Value" shall mean the greater of Two Hundred Sixty-seven Thousand Five Hundred U.S. Dollars ($267,500.00) and the Future Valuation Price (as defined in Section 2.9(A)(a)) following the exercise of Stacy's Put Right ("Stacy's Minimum Value").

(c)     If the Company terminates the employment of the Continuing Shareholder within ten (10) years of the Original Agreement "without cause" (as defined in Section 5 of each applicable Employment Agreement) or if the Continuing Shareholder terminates his employment within ten (10) years of the Original Agreement "with good reason" (as defined in Section 5 of each applicable Employment Agreement), then, in each case, such Continuing Shareholder shall have an immediate Put Right, exercisable by providing notice of such exercise to GB and each of the remaining Continuing Shareholders within thirty (30) days after the effective date of the termination of his employment, for the a purchase price equal to the applicable Continuing Shareholder's Put Valuation Price.

(d)     If the Company terminates the employment of a Continuing Shareholder within ten (10) years of the Original Agreement "with cause" (as defined in the applicable Employment Agreement) or if a Continuing Shareholder terminates his employment relationship with the Company within ten (10) years of the Original Agreement "without good reason" (as defined in the applicable Employment Agreement), then, in each case, GB shall have the right to require such Continuing Shareholder, individually, to sell all, but not less than all, of the Shares owned by such Continuing Shareholder (a "Call Right"), exercisable immediately and any time thereafter, for a purchase price equal to the par value of the Shares owned by such Continuing Shareholder (i.e. $1.00 per Share), which each Continuing Shareholder irrevocably agrees is fair and

12

reasonable in light of such circumstances. By way of clarification, the Minimum Value Protection shall not apply in the event of the exercise by GB of its Call Right exercised under this Section 2.9(A)(d). Notwithstanding GB exercising its rights under this subsection 2.9(A)(d) against any Continuing Shareholder, the remaining Continuing Shareholders shall nonetheless be entitled to (and shall not be deemed to have forfeited) any of the protections provided by this Agreement (which protections shall continue to run to such other Continuing Shareholders for their Minimum Value Protection). In the event that GB exercises its Call Right under this subsection 2.9(A)(d) with respect to any Continuing Shareholder, GB shall have no further payment obligations of any nature whatsoever except as may be provided under the applicable Employment Agreement.

(e)     Beginning on the third (3rd) anniversary of the date of the Original Agreement, and continuing indefinitely thereafter, GB shall have a Call Right for a purchase price equal to the applicable Call Valuation Price for each Continuing Shareholder. In the event that GB exercises its Call Right under this section 2.9(A)(e) with respect to any Continuing Shareholder, such Continuing Shareholder shall have the right to terminate his Employment Agreement "with good reason" (as defined in the applicable Employment Agreement) and GB shall have the right to terminate his Employment Agreement "without cause" (as defined in the applicable Employment Agreement). During each year expressly permitted in this Agreement, GB shall have the right to exercise the Call Right under this Section 2.9(A)(e) for a period of ninety (90) days after receipt by all of the Shareholders of the Year End Financial Statements (as defined in Section 4.2 hereof).

(f)     (i) In the event of a Put Right or a Call Right being exercised under any of the terms of this Section 2.9(A) (a "Section 2.9(A) P/C Transaction"), the party exercising the Put Right or the Call Right (the "Section 2.9(A) Exercising Party") shall provide written notice to the other party (the "Section 2.9(A) Exercise Notice") within the applicable time period (as specified above), which Section 2.9(A) Exercise Notice shall constitute the Section 2.9(A) Exercising Party's irrevocable agreement to sell or purchase (as applicable) all of the applicable Continuing Shareholder's Shares in accordance with the terms hereof. The Section 2.9(A) Exercising Party shall state in the Section 2.9(A) Exercise Notice which provision of this Section 2.9(A) is being relied upon.

(ii)     Each of the parties to the Section 2.9(A) P/C Transaction shall be obligated to complete the closing of the Section 2.9(A) P/C Transaction within one hundred twenty (120) days from the date that such Put Right or Call Right is exercised.

(g)     In the event of the death of any of the Continuing Shareholders, GB agrees that it shall use the proceeds of the applicable Key Man Insurance (as described in Section 4.3 below) to purchase such deceased Continuing Shareholder's Shares (to the extent that the proceeds of the Key Man Insurance are tendered to GB). Notwithstanding anything to the contrary in this Agreement, the purchase price for such Continuing Shareholder's Shares shall be each such Continuing Shareholder's Minimum Value; provided, however, that in the event that the proceeds of the applicable Key Man Insurance are insufficient to pay such Continuing Shareholder's Minimum Value, GB shall be obligated only to pay to such Continuing Shareholder's estate the proceeds actually received (if any).

(h)     Notwithstanding anything to the contrary in this Agreement, the Shareholders each agree that in the event that the employment of any Continuing Shareholder is terminated due to

13



Disability (as defined in the applicable Employment Agreement) such Continuing Shareholder shall not have a Put Right until the tenth (10th) anniversary of the date of the Original Agreement (as set forth in Section 2.9(A)(b) hereof), and GB shall not have a Call Right until the third (3rd) anniversary of the date of the Original Agreement (as set forth in Section 2.9(A)(e) of this Agreement).

(i)      As security for the payment obligations of GB under this Section 2.9(A), GB and each of the Continuing Shareholders have entered into the Escrow Agreement.

B.      Carlos:

(a)      For purposes of this Section 2.9(B) only, the following terms shall have the following meanings:

"Enterprise Value" shall be equal to the average of the last three (3) years' fiscal year end/EBITDA multiplied by seven (7).

"EBITDA" shall mean net income, including rental income, as defined by U.S. Generally Accepted Accounting Principles, as consistently applied from year to year, and Miscellaneous Items, before interest (income and expense), Income Taxes (defined exclusively as Federal income, state income and local income tax expense/benefit as well as any other tax expense/benefit which is measured as a function of the Company's gross profit or net earnings and which is reported as Income Taxes in the Company's audited Statement of Income or Loss, in accordance with SFAS 109 – Accounting for Income Tax), depreciation and amortization, and which shall exclude all items of extraordinary and exceptional income and expense. "Miscellaneous items" shall only include the following items of income and expenses: volume discounts, rebates, co-op advertising revenue, all bank account activity charges, credit card transaction fees, letter of credit fees, as well as vendor and customer write-offs, customer and/or vendor overpayments and adjustments, write-offs of expired or unused vendor and customer credit memorandums, vendor price adjustments, resolutions and settlement of customer claims, or such other items of income or expense expressly approved by the Majority of the Board. Each item shall be established in accordance with the Financial Statements, as such term is defined in the Stock Purchase Agreement.

"Equity Value of the Company" shall mean the Enterprise Value of the Company minus the Company's Net Financial Position, where:

"Net Financial Position" shall mean all interest bearing debt of any nature whatsoever, including, but not limited to, controlled disbursements, bank overdraft or similar, less all cash, cash equivalents and liquid securities as of December 31 of the most recent fiscal year used in establishing the "Equity Value of the Company"; provided, however, that all trade payables and receivables with GB and/or its affiliates which are past due (in the ordinary course of business) by more than thirty (30) days shall be considered interest bearing debt.



"Future Valuation Price", shall mean Carlos' pro rata ownership of Shares of the Company as of the applicable date multiplied by the Equity Value of the Company as of such date.

"Call Valuation Price" shall mean the Future Valuation Price of the Company.

"Put Valuation Price" shall mean eighty-five percent (85%) of the Future Valuation Price.

"Future Purchase Price" shall mean the amount actually paid to Carlos pursuant to this Section 2.9(B).

(b)    Beginning on the tenth (10th) anniversary of April 29, 2005 and continuing indefinitely thereafter, Carlos, shall have the right, but not the obligation, to require GB Miami to purchase all, but not less than all, of the Shares owned by him (a "Put Right") for a Future Purchase Price equal to the Put Valuation Price. During each year expressly permitted in this Agreement (after the tenth anniversary of April 29, 2005), Carlos shall have the right to exercise the Put Right by providing notice of such exercise to GB Miami within ninety (90) days after receipt by all of the Shareholders of the Year End Financial Statements (as defined in Section 4.2 hereof).

(c)    If the Company terminates the employment of Carlos within ten (10) years of April 29, 2005 "without cause" (as defined in Section 5(e) of the Carlos Employment Agreement), then Carlos shall have a Put Right, exercisable by providing notice of such exercise to GB Miami within thirty (30) days after the effective date of the termination of his employment, for the purchase price equal to the Put Valuation Price.

(d)    If the Company terminates the employment of Carlos within ten (10) years of April 29, 2005 "with cause" (as defined in Section 5(d) of the Carlos Employment Agreement) or if Carlos terminates the Carlos Employment Agreement under paragraph 5(a) of such agreement within ten (10) years of April 29, 2005, then, in each case, GB Miami shall have a call right, exercisable immediately, and continuing thereafter, for a total purchase price of One Dollar ($1.00) for all of Carlos' ownership in the Company; provided, however, that, if Carlos' employment is terminated "for cause" under Section 5(d)(iii) (conviction of a felony as governed by Section 5(d) of the Carlos Employment Agreement) of the Carlos Employment Agreement after the fifth (5th) anniversary of the date hereof and such felony does not result in any material damage to the Company, then, GB Miami shall have a call right at forty percent (40%) of the Put Valuation Price. Carlos hereby irrevocably agrees that such provision is fair and reasonable in light of such circumstances.

(e)    (i)    Beginning on the eighth (8th) anniversary of April 29, 2005, and continuing indefinitely thereafter, GB Miami shall have the right, but not the obligation, to require Carlos to sell all, but not less than all, of the shares owned by him (a "Call Right") to GB Miami for a price equal to the Call Valuation Price. In the event that GB Miami exercises its Call Right under this subsection 2.9(B)(e), either Carlos or the Company shall have the right to terminate the Carlos Employment Agreement. If Carlos exercises his right to terminate the Carlos Employment Agreement, such termination shall be deemed to being made under Section 5(a) of the Carlos Employment Agreement. If the Company exercises its right to terminate the Carlos Employment Agreement, such termination shall be deemed to being made under Section 5(e) of the Carlos Employment Agreement. During each year expressly permitted in this Agreement, The GB




15

Companies shall have the right to exercise the Call Right for a period of ninety (90) days after receipt by all of the Shareholders of the Year End Financial Statements (as defined in Section 4.2 hereof). In the event that GB Miami ever exercises its Call Right, and, within six (6) months of the purchase of Carlos' shares, GB Miami sells any or all of its shares in the Company at a price higher than the Call Valuation Price, GB Miami shall at that time pay Carlos a sum of money equal to the difference between (1) the price equal to the Call Valuation Price paid to Carlos, and (2) the price for the sale of shares to another.

(f)     (i) In the event of a Put Right or a Call Right being exercised under any of the terms of this Section 2.9(B) (a "Section 2.9(B) P/C Transaction"), the party exercising the Put Right or the Call Right (the "Section 2.9(B) Exercising Party") shall provide written notice to the other party (the "Section 2.9(B) Exercise Notice") within the applicable time period (as specified above), which Section 2.9(B) Exercise Notice shall constitute the Section 2.9(B) Exercising Party's irrevocable agreement to sell or purchase (as applicable) all of the applicable shares in accordance with the terms hereof. The Section 2.9(B) Exercising Party shall state in the Section 2.9(B) Exercise Notice which provision of this Section 2.9(B) is being relied upon. The Future Purchase Price shall be paid in cash or pursuant to wire transfer instructions.

(ii) Each of the parties to the Section 2.9(B) P/C Transaction shall be obligated to complete the closing of the Section 2.9(B) P/C Transaction within one hundred eighty (180) days from the date that such Put Right or Call Right is exercised.

(g)     In the event of the death of Carlos, GB Miami agrees that it shall purchase his shares for the lesser of (i) the Put Valuation Price if purchased within 180 days of death, or (ii) the net proceeds of the Key Man Insurance stated in paragraph 4.3 if GB Miami receives the proceeds of such insurance (i.e. on or before December 31, 2008 - $1,000,000 and thereafter $2,500,000 if such increase is available at commercial rates).

(h)     Notwithstanding anything to the contrary in this Agreement, the Company and GB Miami each agree that in the event that the employment of Carlos is terminated due to Disability (as defined in the Carlos Employment Agreement), Carlos shall have an immediate Put Right and GB Miami shall have an immediate Call Right. This right shall be exercisable thereafter.

2.10    Permitted Transfers to Affiliates. Notwithstanding anything to the contrary in this Agreement, a Shareholder may transfer all or any portion of its Shares to its affiliates, or, in the case of an individual, to a spouse, family trust or other entity for the express purpose of estate planning (collectively a "Estate Transferee"); provided, however, in each case that at least twenty (20) days prior written notice is provided to the Company; and provided further, that such Shareholder and the Estate Transferee shall be jointly and severally liable for all of such Shareholder's obligations under this Agreement and the Stock Purchase Agreement.

2.11    Delivery of Shares. Each of the Continuing Shareholders agree that GB shall not be obligated to make any payment for the purchase of such Continuing Shareholder's Shares unless such Continuing Shareholder shall deliver (and make available for review by GB and the Escrow Agent) any and all share certificates evidencing such Shares (together with an executed stock power). Carlos agrees that GB Miami shall not be obligated to make any payment for the purchase

16

4.2    Reports. (a)    The Company, the Continuing Shareholders and Carlos, as the primary officers of the Company, will furnish to the Shareholders: (i) annually, within 90 days after fiscal year end, audited financial statements (including a balance sheet, income statement and cash flow statements) and a comparison of such statements for the previous fiscal year, certified by the Company's auditors (the "Year End Financial Statements"); (ii) quarterly, no later than 45 days after the end of each quarter, unaudited financial statements (including a balance sheet, income statement and cash flow statements); (iii) a monthly management report, no later than 15 days after the end of each month, containing such information as shall be determined the Majority of the Board.

(b)    Until the exercise of Weiner's Second Put Right (as defined in Section 2.9(b)(ii)(C) hereof) and the full payment by GB to Weiner for such Second Put Right as required by Section 2.9(b), Weiner, with the assistance of the Company's Comptroller, shall at least 30 days prior to the first day of each annual operating period, submit to the Board of Directors an annual operating plan and budget. The GB Companies acknowledge that only Weiner shall prepare and submit all such annual operating plans and budgets to the Board of Directors. The other Continuing Shareholders shall provide all necessary and appropriate assistance to Weiner in connection with the preparation of the annual operating plan and budget. The parties acknowledge that the Company's annual operating plan and budget is and remains an internal management tool with which The GB Companies provide business growth and profitability goals to the management of the Company.

(c)    The Company, the Continuing Shareholders and Carlos, as the primary officers of the Company shall submit, from time to time, such other monthly and other reports and other information to the Board of Directors that the Majority of the Board reasonably requests.

(d)    In addition to being provided the information required in Subsection 4.2(a) - (c) above, each Shareholder, at its own cost and expense, shall be entitled to review and inspect the books and records of the Company, inspect the properties of the Company and consult with the management of the Company, upon at least two (2) business days prior notice.

4.3    Key-Man Life Insurance. (a) The Company, GB, Carlos and the Continuing Shareholders, as the primary officers of the Company, shall be obligated, at all times after the date hereof, to maintain key man life insurance policies on the lives of the Shareholders as follows: (i) Weiner – Five Million Three Hundred Thousand Dollar ($5,300,000.00), with the sole beneficiary being GB, (ii) Pennington – Two Million Dollar ($2,000,000.00), with the sole beneficiary being GB, (iii) Stacy – Seven Hundred Fifty Thousand ($750,000.00), with GB being a 50% beneficiary and Stacy directing, in his sole discretion, the other 50% beneficiary, and (iv) (A)from the period from the date hereof until December 31, 2008, Carlos – One Million Dollars ($1,000,000.00) and (B) from January 1, 2009 onward, Carlos – Two Million Five Hundred Thousand Dollars ($2,500,000.00) (if such is available at commercial rates), with the sole beneficiary being GB Miami (collectively, the "Key Man Insurance"). Notwithstanding the foregoing, following the exercise of Weiner's First Put Right (as defined in Section 2.9(A)(b)(ii)(C) of this Agreement) the Company, GB, Carlos and the Continuing Shareholders, as the primary officers of the Company, shall be obligated to maintain a Two Million Five Hundred Thousand Dollar ($2,500,00.00) key man life insurance policy on the life of Weiner, with the sole beneficiary being GB. The Company and the Shareholders acknowledge and agree that any and all proceeds of Key Man Insurance received by GB shall be used by GB solely to purchase the Shares of the Continuing Shareholders and any and all proceeds received by GB Miami shall be used by GB Miami solely to purchase the Shares of

18



Carlos to the extent necessary to fulfill GB's or GB Miami's, as applicable, obligations under Section 2.9(A)(g) above in the case of the Continuing Shareholders and Section 2.9(B)(g) in the case of Carlos. The Continuing Shareholders, Carlos and the Company agree and acknowledge that the above obligations are material obligations of this Agreement.

(b)    The Continuing Shareholders and Carlos acknowledge and agree that, to the extent that the proceeds of the applicable Key-Man Life Insurance policy is less than the amount required to be paid by GB or GB Miami, as applicable, under Section 2.9(A)(g) in the case of the Continuing Shareholders or Section 2.9(B)(g) in the case of Carlos, GB shall only be required to pay to such Continuing Shareholders and GB Miami shall only be required to pay to Carlos the amount actually received by GB or GB Miami, as applicable, under such policy in consideration for all of such Continuing Shareholder's or Carlos' shares.

4.4    Confidentiality.  The Company, the Continuing Shareholders and Carlos, as the primary officers of the Company, shall at all times require that all officers, employees and consultants of the Company having access to confidential information of the Company shall be required to execute a confidentiality agreement with respect to such information. In addition, all officers and other employees shall be required to execute a non-competition agreement with the Company, which shall be valid during such individual's term of service to the Company, and for a period of at least one (1) year thereafter.

## ARTICLE V

### General Provisions

5.1    Specific Performance.  The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof in the District Court of Wyandotte County, Kansas, or in the United States District Court sitting in Kansas City, Kansas (this being in addition to any other remedy to which they are entitled at law or in equity), and each party hereto agrees to waive in any action for such enforcement the defense that a remedy at law would be adequate.  In addition, a party that prevails in any such enforcement of the terms and provisions of this Agreement shall be reimbursed by the non-prevailing party(ies) for all costs and expenses, including legal fees, which it may incur in pursuing such enforcement.

5.2    Governing Law and Consent to Jurisdiction.  (a) This Agreement shall be governed by and construed in accordance with the internal substantive laws and not the choice of law rules of the State of Kansas.

(b)    Any and all disputes with respect to this Agreement must be brought in the form of a judicial proceeding in the District Court of Wyandotte County, Kansas, or in the United States District Court sitting in Kansas City, Kansas, and, by execution and delivery of this Agreement, each party (i) accepts, generally and unconditionally, the exclusive jurisdiction of such courts and any related appellate court, and irrevocably agrees to be bound by any judgment rendered



19

thereby in connection with this Agreement and (ii) irrevocably waives any objection it may now or hereafter have as to the venue of any such suit, action or proceeding brought in such a court or that such court is an inconvenient forum.

5.3   Term of Agreement.   This Agreement shall terminate in its entirety upon the occurrence of any of the following events:

(i)   A sale of the Company (including by way of merger or a sale of assets) approved pursuant to the provisions hereof;

(ii)   Upon The GB Companies becoming the owner of all of the Shares; and

(iii)   December 31, 2020, unless the applicable P/C Transaction has not been completed, in which event the Agreement shall terminate upon the completion of such P/C Transaction.

provided, however, that the termination of this Agreement shall not discharge any obligations of the parties which may have accrued under the terms of this Agreement pursuant to any event which caused such termination.

5.4   Cooperation.   Each of the parties hereto shall use its reasonable efforts to take or cause to be taken all actions, to cooperate with the other party hereto, with respect to all actions, and to do or cause to be done all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement.

5.5   Waiver.   Any failure of the Continuing Shareholders to comply with any of their obligations or agreements herein contained may be waived only in writing by The GB Companies. Any failure of The GB Companies to comply with any of their obligations or agreements herein contained may be waived only in writing by the Continuing Shareholders, whether one or more, which is the beneficiary of such obligation or agreement.

5.6   Notices.   All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given upon receipt of: hand delivery; certified or registered mail, return receipt requested; or telecopy transmission with confirmation of receipt:

(i)   If to any of the Continuing Shareholders, to:

Jeffrey A. Weiner
19111 Collins Avenue Unit #606
Sunny Isles Beach, Florida 33160
Facsimile:   (913) 371-3222
Telephone:   (913) 371-8585

(with a copy to)

20

Shughart Thomson & Kilroy, P.C.
Twelve Wyandotte Plaza
120 West 12th Street, Suite 1800
Kansas City, Missouri 64105
Attention: Michael B. Shteamer, Esq.
Facsimile:      816-374-0509
Telephone:      816-421-3355

(ii)    If to GB or GB Miami, to

GB International S.p.A.
Via Dell' Industria 22
41100 Modena (Italy)
Attention: Dott. Filippo Borghi
Facsimile:      011-39-059-289091

(with a copy to)

Donovan & Giannuzzi, LLP
261 Madison Avenue
New York, New York 10016
Attention: Nicholas L. Giannuzzi, Esq.
Facsimile:      212-223-0966
Telephone:      212-980-1900

(iii)   If Carlos, to:

Carlos Alberto Teran Bendaña
280 Hampton Lane
Key Biscayne, FL  33149
Facsimile:
Telephone:

(with a copy to)

White & Case, LLP
200 S. Biscayne Blvd.
Suite 4900
Miami, FL 33131
Attention: John Murphy, Esq.
Facsimile: (305) 358-5744
Telephone: (305) 995-5264

Such names and addresses may be changed by written notice to each person listed above



21

5.7    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

5.8    Headings. The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

5.9    Entire Agreement. This Agreement, including the Exhibits and Schedules hereto and the documents referred to herein, embodies the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein. This Agreement supersedes the Original Agreement and all prior agreements and understandings between the parties with respect to such subject matter. Any and all prior shareholders agreements or similar agreements involving the Company and/or any of the Continuing Shareholders (if any) is hereby automatically terminated and of no further force or effect.

5.10    Amendment and Modification. This Agreement may be amended or modified only by written agreement of the Continuing Shareholders, Carlos and The GB Companies.

5.11    Binding Effect; Benefits. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns; nothing in this Agreement, express or implied, is intended to confer on any person other than the parties hereto and their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement.

5.12    Assignment. This Agreement may not be assigned by any Shareholder without the prior written consent of the other Shareholders, provided, however, that this Agreement may be assigned to any Shareholder to a Successor Shareholder in strict compliance with the terms of this Agreement.

5.13    Approvals and Consents of Sellers. (a) Each of the Continuing Shareholders irrevocably (i) agrees that, from the date hereof, Weiner shall have the sole and exclusive authority to take all actions and make all decisions on behalf of all of the Continuing Shareholder in connection with this Agreement, and The GB Companies may rely on any and all decisions, consents, approvals and/or other actions of Weiner as if such decision, consent, approval or other actions was performed unanimously by all of the Continuing Shareholders, (ii) constitutes and appoints Weiner its true and lawful attorney-in-fact with full power and authority in its name, place and stead to execute, acknowledge, deliver, swear to file, and record at the appropriate public offices such documents as Weiner, in his sole discretion determines, including but not limited to any certificates and all amendments thereto, and all amendments to this Agreement; provided, however, that in the event Weiner is no longer a Continuing Shareholder, then the remaining Continuing Shareholders shall designate one of them to take all actions and make all decisions on their behalf as provided above, and such Continuing Shareholder shall be irrevocably constituted and appointed as the remaining Continuing Shareholders' attorney-in-fact as provided above. The remaining Continuing Shareholders shall provide notice to the Company and The GB Companies of each such designation.



22

(b)      The appointment by all Continuing Shareholders of Weiner, or his successor, as attorney-in-fact shall be deemed to create a power coupled with an interest, and shall survive any bankruptcy, death, adjudication of incompetence or dissolution of any person giving such power, and the transfer of all or any part of the Shares of such Continuing Shareholders, unless such transfer is to either of The GB Companies in which case the appointment of Weiner as attorney-in-fact shall be deemed terminated with respect to the Shares transferred to either of The GB Companies.

5.14    <u>Severability.</u> If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

5.15    <u>Representation by Donovan & Giannuzzi, LLP.</u>   Each of the parties hereto acknowledges and understands the Donovan & Giannuzzi, LLP ("D&G") has represented GB in its previous purchase of a majority of the Company and has represented GB Miami in its previous purchase of Teran Tractor Company. Each of the parties hereto (and the shareholders and directors of such parties) have requested that D&G act as the sole law firm to be used by the parties in connection with this Agreement and all of the agreements contemplated pursuant to the Merger, and hereby irrevocably waives any all conflicts that may arise from the role of D&G as the only counsel involved.  Each of the parties has suggested to its shareholders and directors to obtain its own individual counsel to review this Agreement.

*[SIGNATURE PAGE TO FOLLOW]*

23



IN WITNESS WHEREOF, the parties hereto have duly executed this Second Amended and Restated Shareholders Agreement as of the date first above written.

AMERICAN CRANE AND TRACTOR PARTS, INC.

By: _____

    Jeffrey A. Weiner
    President

GB INTERNATIONAL S.P.A.

By: _____
    Name:
    Title:

GB MIAMI S.R.L.

By: _____
    Name:
    Title:

_____
JEFFREY A. WEINER

_____
HARRY B. PENNINGTON

_____
KENNETH P. STACY

_____
CARLOS ALBERTO TERAN BENDANA

24



AGREED AND CONSENTED TO:

_Barbara Weiner_

BARBARA WEINER, spouse of
Jeffrey A. Weiner


_____

PATRICIA PENNINGTON, spouse of
Harry B. Pennington


_____

MONICA STACY, spouse of
Kenneth P. Stacy


_____

SOLANGE TERAN, spouse of
Carlos Alberto Teran Bendana

25

AGREED AND CONSENTED TO:

_____
BARBARA WEINER, spouse of
Jeffrey A. Weiner

_____
PATRICIA PENNINGTON, spouse of
Harry B. Pennington

_____
MONICA STACY, spouse of
Kenneth P. Stacy

_____
SOLANGE TERAN, spouse of
Carlos Alberto Teran Bendana

25

AGREED AND CONSENTED TO:

_____
BARBARA WEINER, spouse of
Jeffrey A. Weiner

_____
PATRICIA PENNINGTON, spouse of
Harry B. Pennington

_____
MONICA STACY, spouse of
Kenneth P. Stacy

_____
SOLANGE TERAN, spouse of
Carlos Alberto Teran Bendana

25

Nov. 30. 2006 12:17PM                                No. 0382   P. 1/

AGREED AND CONSENTED TO:

_____
BARBARA WEINER, spouse of
Jeffrey A. Weiner

_____
PATRICIA PENNINGTON, spouse of
Harry B. Pennington

_____
MONICA STACY, spouse of
Kenneth P. Stacy

_____
SOLANGE TERAN, spouse of
Carlos Alberto Teran Bendana

Attn: Nick G.

25

# EXHIBIT A

## AMENDED AND RESTATED

## ESCROW AGREEMENT

Schedule 1.2

INITIAL BOARD OF DIRECTORS

Filippo Borghi – Chairman
Stefano Borghi
Giorgio Fioranelli
Salvatore Mazzotta
Jeffrey A. Weiner
Harry B. Pennington
Carlos Alberto Teran Bendaña

27

January 9, 2008

**VIA REGISTERED MAIL**
**RETURN RECEIPT REQUESTED**

Dott. Filippo Borghi
GB International S.p.A.
Via Dell' Industria 22
41100 Modena (Italy)

    Re:    **Section 2.9 A. Notice of Exercise of Put Right under Second Amended**
              **And Restated Share holders Agreement dated November 9, 2006**

Dear Filippo:

    Please take notice that I, Harry B. Pennington on this 9th day of January, 2008, hereby exercise the Put Right granted to me pursuant to Section 2.9 A (b)(ii)(A) of the Second Amended and Restated Shareholders Agreement ("Agreement") dated November 9, 2006, by and among American Crane and Tractor Parts, Inc. (the "Company"), GB International S.p.A. ("GB"), GB Miami" S.r.l., a corporation organized pursuant to the laws of Italy ("GB Miami" together with GB, "The GB Companies"), Jeffrey A. Weiner ("Weiner"), Kenneth P. Stacy ("Stacy"), Carlos Alberto Teran Bendana ("Carlos"), and myself.

    GB is required to purchase all of the shares of Common Stock of the Company owned by me, which total Nine Hundred Seven and Twenty-five Thousandths (907.025) shares. Pursuant to Section 2.9 A (b)(ii)(A) of the Agreement, the required purchase price to be paid to me for these shares is the "Minimum Value," defined in Section 2.9 A (b)(ii)(Y) of the Agreement as Two Million Fifty-eight Thousand Four Hundred Thirteen U.S. Dollars ($2,058.413.00)

    In Accordance with Section 2.9 A (f)(ii) of the Agreement, this transaction must be completed by May 8, 2008, which is one hundred twenty (120) days from the date of this Notice.

                      Very truly yours,

                      *Harry B. Pennington*

                      Harry B. Pennington
                      4513 NE De La Mar Court
                      Lee's Summit, MO 64064

EXHIBIT "B"

Exhibit A

Dott. Filippo Borghi
January 9, 2008
Page 2


cc:   GB International S.p.A.
      Via Dell' Industria 22
      41100 Modena, (Italy)
      Attention: Dott. Filippo Borghi

      GB Miami S.p.A.
      c/o GB International S.p.A.
      41100 Modena (Italy)
      Attention: Dott. Filippo Borghi

      Mr. Jeffrey A Weiner
      19111 Collins Avenue, Unit #606
      Sunny Isles Beach, FL 33160

      Mr. Kenneth P. Stacy
      c/o Mr. Jeffrey A. Weiner
      19111 Collins Avenue, Unit #606
      Sunny Isles Beach, FL 33160

      Mr. Carlos Alberto Teran Bendana
      280 Hampton Lane
      Key Biscayne, FL 33149

      Nicholas L. Giannuzzi, Esq.
      Donovan & Giannuzzi, LLP
      261 Madison Avenue
      New York, NY 10016

      John Murphy, Esq.
      White & Case, LLP
      200 S. Biscayne Blvd., Suite 4900
      Miami, FL 33131